# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

### DOCKET NO. 3:06-CR-378-W

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | **ORDER** |
| **SALVADOR CASTANEDA-ABREGO,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

THIS MATTER came before the Court on 8 December 2006 for hearing on Defendant's motion to suppress evidence allegedly sought and seized in violation of the Fourth Amendment (Doc. No. 13). A partial disposition was rendered from the bench and a few unresolved matters were taken under advisement. For the reasons that follow, Defendant's motion is granted in part and denied in part.

### FINDINGS OF FACT

Based upon the testimony and evidence received, with due regard given to assessment of credibility, the Court makes the following findings of fact:

On 20 June 2006, a group of police officers conducted a knock-and-talk at 7705 Antlers Lane, Apartment 20, after receiving a tip from a confidential informant that an individual known as "Chavo" (later identified as the Defendant, Salvador Castaneda-Abrego) was in possession of marijuana and a firearm at that location. Upon arriving at the apartment complex, it was observed that Defendant's vehicle, a white Cadillac, was gone from the parking lot. Detective Whitesel, who was dressed in plainclothes and displayed no police identification, went up alone to the apartment in question and knocked on the door, which was answered by a young woman (later identified as

Tiffany Lowery, the Defendant's girlfriend). Detective Whitesel stated that he was looking for a fictitious person named Norma. Ms. Lowery responded that she lived there with her boyfriend and his mother and sister and did not know anyone by that name. Detective Whitesel left the apartment and reported the encounter to the other officers.

A short time later, Detectives Olmeda and Phillips and Officer Worley returned to the apartment to conduct the knock-and-talk. Detective Olmeda identified himself to Ms. Lowery as a Charlotte-Mecklenburg Police Officer and asked if the police officers could step inside to discuss some matters they thought best not to air in public. Once inside, Detective Olmeda sought and was granted Ms. Lowery's permission to conduct a security sweep of the apartment, since a surveillance officer had reported that a Hispanic male might have entered the apartment right before the officers' arrival. The security sweep revealed that Ms. Lowery was home alone.

Detective Olmeda then told Ms. Lowery that the police had received a complaint of drug activity in the apartment. He asked her if she lived there, to which she responded that she had been staying there with the Defendant since the prior Saturday (i.e., approximately four days' time). He asked her if she kept her personal effects (such as a toothbrush and clothing) there, which she answered affirmatively. Detective Olmeda again asked: "So do you live here?" Ms. Lowery responded: "Yes." Detective Olmeda then asked if she would mind their searching the apartment for drugs and guns, to which she manifested her consent, as corroborated by the testimony of the three police officers then present. Ms. Lowery's consent was voluntary, unequivocal, unlimited as to scope, and not revoked at any time during the search. Furthermore, Ms. Lowery possessed the actual authority to consent to a search of the common areas of the apartment as well as the bedroom she occupied with the Defendant, by virtue of her co-habitation with the Defendant for at least three

consecutive nights prior to the knock-and-talk. Additionally and alternatively, it was objectively reasonable for the officers to believe that Ms. Lowery possessed the apparent authority to consent to a search, by virtue of her representations as confirmed throughout the course of the search by tangible indicia of her co-habitation with the Defendant.[1]

Upon obtaining consent to search, Detective Phillips, a trained K9 officer, retrieved his drug dog from the car. Detective Phillips led the dog through the apartment without objection from Ms. Lowery. While in the master bedroom, the dog alerted to a small table next to the bed on which laid visible residual traces of marijuana. The dog also "showed interest" in a small area of carpet near an open closet and approximately six to twelve inches away from a closed blue suitcase. The dog did not alert to the blue suitcase itself, in which was later discovered a considerable stash of marijuana. Officer Phillips testified that he was "disgusted" with the performance of his dog for failing to alert to the suitcase.

Detective Olmeda then began a more thorough search of the master bedroom. This included opening a blue suitcase lying in plain view on the bedroom floor in front of the closet. The zipper on the suitcase was closed but not locked. The suitcase did not bear a name tag or other identifying characteristics, and although Detective Olmeda described it as "more feminine" looking, he conceded that "it could have been anyone's suitcase." Moreover, Detective Olmeda did not ask Ms. Lowery if the suitcase belonged to her or if he might look inside it, despite the fact that she was

---

[1] In addition to the contraband found in the apartment, the search revealed Ms. Lowery's blue denim purse in the master bedroom, woman's clothing hanging in the master closet and in stowed the dresser, and feminine hygiene products believed to be Ms. Lowery's in the master bathroom.

sitting in the living room just steps away.[2]  Inside the suitcase was discovered  multiple pounds of

marijuana packaged for bulk sale.  After further searching, officers found two more bags of

marijuana, in plain view, in the open drawer of a file cabinet being used as a dresser and also

containing articles of both man's and woman's clothing.

The search also produced several other items of physical evidence, including: a loaded

Intratec 9mm "Tec-9" assault-style pistol under the mattress of the bed in the master bedroom and

a box of 9mm cartridges in a file cabinet drawer; $4100 in cash; a digital scale; a DMV-style

photographic identification machine; and a .38 caliber Smith & Wesson revolver in the apartment's

second bedroom.  Both firearms were later discovered to be stolen.

Meanwhile, Detective Phillips waited outside for the Defendant to return.  He executed a

traffic stop when the Defendant's white Cadillac entered the apartment complex, and immediately

placed the Defendant under arrest.  The Defendant was not Mirandized at the time of his arrest or

at any point that day.[3]  The Defendant made inculpatory statements in response to police questioning,

which the Government has agreed voluntarily to suppress.  Some of the Defendant's statements

helped lead to the discovery of the Tec-9 concealed under the mattress and the digital scale in the

bedroom.  Finally, the Defendant made several spontaneous, voluntary statements while sitting on

the couch next to his girlfriend after his arrest.

During one such conversation, Ms. Lowery stated that she was afraid of getting in trouble

because "I live here too," to which the Defendant replied: "It's mine.  You don't have anything to

---

[2] When Ms. Lowery's purse was discovered in the bedroom, Detective Whitesel first sought Ms. Lowery's permission to look through it before proceeding to do so.  Clearly, this is the better police practice, as a like inquiry with regard to the suitcase might have conclusively negated Defendant's argument as to the illegality of that search.

[3] The Defendant was Mirandized the following day, knowingly and voluntarily waived his rights, and gave an oral and written confession.

worry about." This is corroborating circumstantial evidence that Ms. Lowery did in fact possess

actual authority to consent to a search of the apartment. During another spontaneous exchange, Ms.

Lowery told the Defendant that she had let the officers search the apartment because they had

showed her a search warrant. While clearly untrue, this statement is corroborating circumstantial

evidence that she gave the police consent to search: first, because the fact she lied to the Defendant

about the cause of the search demonstrates a consciousness of guilt and responsibility for exposing

him to criminal liability; and second, because it squarely contradicts her testimony now that she

explicitly withheld consent to search.

ANALYSIS

The primary question presented in this case is whether, absent a search warrant supported by

probable cause, the police may legally search for and seize the drugs and guns found in the

Defendant's apartment.[4]  Consent is a well-established exception to the Fourth Amendment

prohibition against warrantless searches, provided that the consent is voluntarily obtained "either

from the individual whose property is searched or from a third party who possesses common

authority over the property searched." Illinois v. Rodriguez, 497 U.S. 177, 181 (1990). In this case,

the Government relies on the third-party consent given by Ms. Lowery.

A.      Lowery's Authority to Consent

Because the purpose of the exclusionary rule is to deter constitutionally unreasonable police

behavior, it is sufficient that the person giving third-party consent have at least the apparent authority

---

[4] It is undisputed that the police did not obtain a warrant to search the apartment or any of the containers (e.g., closet, file cabinet, suitcase) found therein. Moreover, the drug dog did not alert to either of the locations where bagged marijuana was found, and Detective Phillips testified that the police had no "specific information that there was marijuana in the suitcase."

to consent to the search. <u>Roderiguez</u>, 497 U.S. at 186. However, the apparent authority rule does

not mean that the police may always accept a person's invitation to enter and search the premises:

> Even when the invitation is accompanied by an explicit assertion that
> the person lives there, the surrounding circumstances could
> conceivably be such that a reasonable person would doubt its truth
> and not act upon it without further inquiry. As with other factual
> determinations bearing upon search and seizure, determination of
> consent to enter must be judged against an objective standard: would
> the facts available to the officer at the moment warrant a man of
> reasonable caution in the belief that the consenting party had authority
> over the premises? If not, then warrantless entry without further
> inquiry is unlawful unless authority actually exists. But if so, the
> search is valid.

<u>Id.</u> at 188-89 (internal quotation marks and citations omitted).

In determining the constitutional validity and scope of the search, the Court is guided by what

is objectively reasonable given Ms. Lowery's representation that she had been staying with the

Defendant for only four days' time. Of course, authority over a premises is not a function of length

of occupation, but it is an indicium of the extent of the access to (and therefore common authority

over) the co-occupant's private spaces or personal effects. To be reasonable, the circumstances must

demonstrate that Ms. Lowery was more than just a casual guest or visitor of the Defendant. <u>Cf.</u>

<u>Reeves v. Warden</u>, 346 F.2d 915, 924 (4th Cir. 1965) (houseguest had no authority to consent to

search of bedroom regularly and exclusively used by the defendant). In the aggregate, the facts that

Ms. Lowery had been co-habiting with the Defendant for at least three consecutive nights, had her

personal effects intermingled with the Defendant's in the master bedroom and bathroom, and was

home alone (and, therefore, permitted to stay at the apartment in the Defendant's absence), all

support the conclusion that she possessed the authority, actual or apparent, to consent to a search of

the apartment's common areas as well as the master bedroom that she jointly occupied with the

Defendant.

B.      The Plain-View Marijuana

It follows, therefore, that the two bags of marijuana found in plain view in the bedroom are not subject to suppression. See Coolidge v. New Hampshire, 403 U.S. 443 (1971) (plurality opinion) (seizure of evidence is justified under exception to the warrant requirement when the police have "a prior justification for an intrusion in the course of which" they come across a piece of incriminating evidence); United States v. Block, 590 F.2d 535, 539 n.5 (4th Cir. 1978) (valid third party consent. "gives the police legal access and provides them the same non-trespassory vantage points that justify their plain-view searches and seizures").

C.      The Intratec 9mm "Tec-9" Pistol

Ms. Lowery's valid consent to search the apartment not only permitted the police to enter the shared bedroom to search for items in plain view, but also necessarily gave them license to search the furniture jointly used by the Defendant and Ms. Lowery, including the bed and file cabinet. See United States v. Aghedo, 159 F.3d 308, 311 (7th Cir. 1998) (co-habitant's consent to search bedroom over which she had plenary access extended to space underneath mattress). Therefore, the Tec-9 handgun found in the course of the search under the mattress of the Defendant's bed (and the 9mm cartridges found in the file drawer) are not subject to suppression.

D.      The Suitcase Marijuana

The bags of marijuana found in the suitcase present a more difficult question, because luggage is a uniquely personal belonging which often may not be jointly shared even among co-habitants.

Ordinarily, as the Government contends, "general consent [to a search] permits the opening

7

of closed but unlocked containers found in the place as to which consent was given." United States v. Jones, 356 F.3d 529, 534 (4th Cir. 2004) (quoting United States v. Gant, 112 F.3d 239, 243 (6th Cir. 1997)).  Moreover, since "[t]he scope of a search is generally defined by its expressed object," a search with the stated objective of finding drugs permits an inference that "general consent to search [an area] include[s] consent to search containers [like luggage] within that [area] which might bear drugs."  Florida v. Jimeno, 500 U.S. 248, 251 (1991).

None of these cases, however, deal with third-party consent situations, and in such cases as this the above-stated presumptions cannot be conclusive if the third party has no actual or apparent authority over the discrete space searched.  In United States v. Matlock, 415 U.S. 164 (1974), the Supreme Court, presented with facts nearly indistinguishable from those at bar, reversed and remanded a district court order suppressing evidence found in a diaper bag inside a room jointly occupied by the defendant and his amour, after she gave voluntary consent to search the house. The Matlock Court held that "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." Id. at 170.  Such common authority rests on "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed [that] risk."  Id. at 171 n.7.

As many commentators have noted, however, the Matlock Court's opinion neglected to give any careful consideration to the more precise issue of "whether the bag within which the [evidence] was found was jointly used," and instead focused solely on whether "there was generally a sharing of the bedroom."  4 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment

§ 8.3 (4th ed. 2007). Thus, extrapolating from Matlock, the courts and legal commentators have concluded that "[a] protected expectation of privacy may exist where the defendant has taken some special steps to protect his personal effects from the scrutiny of others, but does not unquestionably exist where the co-occupant has ready access (perhaps not theretofore exercised) to the place searched." Id.

Both illustrative and instructive on this point is the Fourth Circuit case of United States v. Block, supra, in which the court suppressed evidence seized from the defendant's footlocker after his mother consented to a search of the house (including the defendant's private bedroom, to which she had "normal free access that heads of household commonly exercise") but never gave valid consent to search the footlocker itself. The Fourth Circuit held that "[w]hile authority to consent to search of a general area must obviously extend to most objects in plain view within the area, it cannot be thought automatically to extend to the interiors of every discrete enclosed space capable of search within the area." 590 F.2d at 541. This is especially true of a person's "valises, suitcases, footlockers, [and] strong boxes" which are "frequently the objects of his highest privacy expectations." Id.

Block elaborates that the touchstone of valid third-party consent is not so much an agency power in the legal sense which is vested in the third party, but rather the extent to which the owner or possessor in the property searched retains an exclusive expectation of privacy *vis-à-vis* third parties. Id. at 539-40 & n.5. Put more simply, the issue is not whether the third party has the authority to waive the Defendant's expectation of privacy in his absence and on his behalf, but rather whether the Defendant has himself relinquished all expectations of privacy with respect to the third party and thereby assumes the risk that she then allows the police her same means of access.

Thus, if the circumstances demonstrate that the search target has provided a third party with ready, unobstructed access to his personal effects, these circumstances would also be sufficient to demonstrate that he has a subjectively reduced expectation of privacy in those effects. Even if he never explicitly authorizes the third party to access them, and even if by practice or tacit agreement no right of access is actually exercised by the third party, he nonetheless knowingly assumes the risk that third-party access may occur. It follows, therefore, that when the third party voluntarily permits the police to exercise her own power of access, there is no Fourth Amendment violation as there has been no unauthorized police intrusion into a space where the search target retains an expectation of privacy.

The court in Block ordered the suppression of evidence retrieved from the footlocker based on: (1) the heightened expectation of privacy that society recognizes in a person's luggage and lockers; (2) the limited right of access that the defendant's mother to his bedroom, and her disclaimer of any right of access to the footlocker itself; and (3) the special precautions that the defendant took to protect his expectation of privacy, including securing the footlocker with a locking mechanism. The case at bar is distinguishable in at least two relevant respects: (1) Ms. Lowery, as a live-in co-habitant of this Defendant, was permitted a plenary right of access to the bedroom and had ready access (even if not theretofore exercised) to the contents of the suitcase; and (2) the Defendant took no special precautions to protect his expectation of privacy in the contents of the suitcase, and in fact the suitcase was lying (albeit zippered shut) unlocked, in plain view, on the floor in the middle of the bedroom.[5] While the Court by no means intends to diminish the heightened expectations of

_____

[5] Moreover, testimony elicited by the Government from Ms. Lowery at the suppression hearing strongly suggests that she was a co-conspirator with the Defendant in the possession and/or distribution of the marijuana in question.
(continued...)

privacy of persons in the contents of their luggage, there are sufficient grounds on this record to

conclude that the Defendant possessed no greater expectation of privacy (*vis-à-vis* Ms. Lowery) in

the suitcase than in the bedroom generally.[6]  Accordingly, Ms. Lowery's consent to search the

bedroom was effective as to the suitcase and the marijuana found therein is not subject to

suppression.

E.        The .38 Caliber Smith & Wesson Revolver

The Court's review of the record in preparing this written Order leads it to reconsider its prior

oral ruling on the admissibility of the revolver found in the apartment's second bedroom.  In its brief,

the Government effectively concedes that Ms. Lowery did not possess authority to consent to search

the second bedroom, which was principally occupied by the Defendant's mother.  This absence of

actual or apparent authority over the second bedroom was further borne out in the officers' testimony

at the suppression hearing.  (See Tr. at 15-16 : "Q: And that was consent – it was your interpretation

of that it was consent to open everything?  A: No.  Mainly just the master bedroom but – because

that's where he told me that she had said that she stayed with the defendant.")  Instead, the

---

[5](...continued)
While this information was unknown to the officers at the time of the search and thus has no bearing on Ms. Lowery's
apparent authority to consent to its search, it supports a holding, in the alternative, that Ms. Lowery in fact possessed an
unqualified right of access to the marijuana and therefore had actual authority to consent to a search inclusive of the
suitcase.

[6] For purposes of clarity, the Court here emphasizes both the proper scope and limits of its holding.  It should
be read narrowly insofar as the Court's determination turns on the specific facts of the case, and clearly a different result
might obtain if the suitcase had been locked or packed away in a place where Ms. Lowery had no ready access, or if Ms.
Lowery had explicitly disclaimed ownership or protested its opening.  But it also should be noted that the Court rejects
the Government's position that the search of the suitcase was validated because Detective Olmeda could have reasonably
believed that the suitcase belonged to Ms. Lowery.  Although Olmeda described the suitcase as "more feminine" looking,
he also conceded that "it could have been anyone's."  The more likely inference to be drawn is that Detective Olmeda
believed the suitcase to be the Defendant's, given that he was there specifically to search for drugs and guns that the
Defendant was reportedly in possession of and a suitcase is a likely place to find that kind of contraband.  Nonetheless,
pursuant to the above-stated analysis, the police need not have indicia of Ms. Lowery's ownership of or authority over
the suitcase to validate its search, but need only have indicia of Ms. Lowery's joint access to it.

Government argues that Defendant lacks standing to contest the search for and seizure of evidence found in his mother's bedroom. However, the Government cites no legal authority in support of this position nor is their sufficient evidence in the record to conclude that the second bedroom was under the sole control and occupation of the Defendant's mother. The general rule therefore applies that the Defendant possesses an expectation of privacy within his home which cannot be violated by the police absent a search warrant, valid consent, or exigent circumstances justifying a warrantless search. Payton v. New York, 445 U.S. 573, 589-90 (1980). Accordingly, the firearm seized in the second bedroom must be suppressed.

F.      Other Evidence

All other evidence not specifically addressed in this written Order shall be admissible for the reasons stated on the record in open court.

CONCLUSION

It is now, therefore, ORDERED that Defendant's motion to suppress (Doc. No. 13) is GRANTED as to the .38 caliber Smith & Wesson revolver and DENIED as to the remainder of the evidence seized during the 20 June 2006 consent search of 7705 Antlers Lane, Apartment 20.

IT IS SO ORDERED.

Signed: January 8, 2007

Frank D. Whitney
United States District Judge